```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
GREGORY RICCIARDI,                    :      15 Civ. 1140 (JCF)

                 Plaintiff,           :      MEMORANDUM
                                      :      AND  ORDER
     - against -                      :
                                      :
COMMISSIONER OF SOCIAL SECURITY,      :
                                      :
                 Defendant.           :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE
```

| USDS SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 11/16/16 |

The plaintiff, Gregory Ricciardi, brings this action pursuant to section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a determination of the Commissioner of Social Security (the "Commissioner") finding that he is not entitled to disability insurance benefits ("DIB"). The parties have submitted cross-motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the plaintiff's motion is denied and the defendant's motion is granted.

Background

    A. Personal History

    Mr. Ricciardi was born in 1960 and resides in Mahopac with his girlfriend Crissi. (R. at 80).[1] He has a high school education and effectively communicates in English. (R at 161, 163). From August 3, 1985, to August 20, 2005, Mr. Ricciardi worked as a New York City firefighter and has not worked thereafter. (R. at 162-63). Since early in his career, he has experienced injuries to his back, including a herniated disc, as well as an ankle condition. (R. at 32-33). The back and ankle issues have persisted since he stopped working. (R. at 29). However, Mr. Ricciardi elected not to pursue surgery on his ankle and has had no treatment for his back. (R. at 35-36).

    The plaintiff began to have memory problems in 2011 due to Lyme disease, for which he received treatment. (R. at 28, 37). According to Mr. Ricciardi, he experienced psychiatric problems in 2011 and 2012, including difficulty with his memory, sleeplessness, nervousness, anxiety, and obsessive thoughts. (R. at 38, 40). However, he never went for psychological treatment or evaluation. (R. at 54).

    Mr. Ricciardi alleges disability since August 20, 2005 (R. at 158), due to bulging disks, intervertebral disc disease, disc

---

[1] "R." refers to the administrative record filed with the Commissioner's answer. Chrissi is alternatively referred to as Mr. Ricciardi's fiancee throughout the administrative record.

protrusions, knee issues, right ankle problems, and Lyme disease. (R. at 162). His last date insured is December 31, 2011. (R. at 158).

B. Medical History

On July 18, 2007, Mr. Ricciardi saw Dr. Andrew Peretz at Somers Orthopaedic Surgery & Sports Medicine Group, PLLC ("Somers Orthopaedic"), for complaints of chronic low back pain. (R. at 282-83). The plaintiff reported that he sustained many work-related injuries to his lower back and that his pain was concentrated in the area of his back towards his right leg. (R. at 282). An examination showed that he had significant stiffness and pain with flexion and extension. (R. at 282). His strength was 5/5 in all muscle groups, and his straight leg raise test was negative. (R. at 282). X-rays showed a loss of lumbar lordosis, discogenic disease at the thoracolumbar junction, and mild-to-moderate discogenic disease throughout his lumbar spine. (R. at 282). Dr. Peretz's impression was that Mr. Ricciardi had chronic low back pain, and he recommended therapy and ordered a Magnetic Resonance Imaging test ("MRI"). (R. at 282-83).

On August 2, 2007, an MRI revealed degenerated, bulging L2-3, L3-4, and L4-5 intervertebral discs with small right foraminal and far lateral disc protrusion at the L2-3 level, which was in contact with the exiting right L2 nerve root. (R.

3

at 288-89).   Additionally, there was a small left paracernal L5-S1 disc protrusion.   (R. at 289).   Finally, there was borderline developmentally shallow lumbar spinal canal, mild multifactorial thecal sac stenosis at the L4-5 level, and lower lumbar facet joint hypertrophic osteoarthrosis.   (R. at 289).

On September 6, 2007, Dr. Peretz evaluated Mr. Ricciardi and found that he appeared to have low back pain and stiffness, but no radicular pain.   (R. at 281).   Dr. Peretz reported that the MRI showed mild degenerative changes at L3-L4, discogenic disease and facet arthorpathy at L4-L5, and a small protrusion at L5-S1.   (R. at 281).   He recommended formal physical therapy but did not believe that surgical intervention was warranted. (R. at 281).

Mr. Ricciardi returned for another evaluation with Dr. Peretz on November 14, 2007, reporting low back pain and some mild left leg pain.   (R. at 280).   He had attended 1-2 sessions of physical therapy but had lost his prescription.   (R. at 280).

On a December 5, 2007, follow-up visit, Dr. Peretz stated that the MRI in August showed an L2-L3 protrusion exiting the right L2 nerve root as well as other multilevel degenerative changes.   (R. at 279).   Physical exams showed that the lumbar spine was intact and there was a good range of motion in the lumbar spine; however, Mr. Ricciardi continued to have spinal

4

and left leg discomfort. (R. at 279). His neurovascular status was intact. (R. at 279).

On December 12, 2007, Dr. Jacob Handszer evaluated Mr. Ricciardi, stating that the plaintiff "is a very pleasant 46-year-old male with low back and right leg pain which radiates into his thigh." (R. at 276-78). Dr. Handszer stated that the plaintiff's pain had been present for two years and had worsened without incident. (R. at 276). The pain was worse when sitting but relieved with changing positions. (R. at 276). Physical therapy provided no relief, but Mr. Ricciardi had tried no other treatments for the pain. (R. at 276).

During the evaluation, Mr. Ricciardi could accomplish heel and toe stands without difficulty, but flexion and extension of his spine produced pain in the lower back. (R. at 277). He had a positive straight leg raise on the right at sixty degrees, but a negative straight leg raise on the left. (R. at 277). Deep tendon reflexes for both knees and both ankles were normal. (R. at 277). Motor strength and sensation were 5/5 in the left and 4/5 in the entire right leg, secondary to pain and weakness. (R. at 277). Furthermore, palpation of his cervical, thoracic, and lumbar spine was within normal limits, and a neurovascular exam was otherwise normal. (R. at 277). His psychiatric exam was normal. (R. at 277). Dr. Handszer reiterated that the August MRI showed a large L2-L3 disc exiting and contacting the

5

L2 nerve root, consistent with Mr. Ricciardi's complaints.  (R. at 278).  Dr. Handszer believed that Mr. Ricciardi suffered from L2-L3 radiculopathy and that he would benefit from lumbar epidural steroid injections.  (R. at 278).  The plaintiff agreed to the procedure (R. at 278), but the appointment was ultimately cancelled (R. at 293).

On April 5, 2010, Mr. Ricciardi visited Dr. Scott Levin. (R. at 270-72).  The plaintiff said that he was an avid skier, that he had hurt his knee "about one year ago skiing," and that he had "tweaked it again while skiing" as recently as one week ago.  (R. at 270).  A physical exam found that he was a "well-developed, well-nourished male in no acute distress, alert and oriented x3."  (R. at 271).  His range of motion was from full extension to 130 degrees of flexion.  (R. at 271).  However, Mr. Ricciardi had pain, mostly in the medial aspect of the knee. (R. at 270).  Upon examination, he had neither tenderness nor pain in his kneecap.  (R. at 271).  He had tenderness at the inside joint line of the knee, but no tenderness at the outside joint line.  (R. at 271).  A varus and valgus stress test revealed a stable knee joint.  (R. at 271).  A Lachman exam was positive, but a McMurray test was negative.[2]  (R. at 271).  An x-

---

[2] A Lachman test is a "maneuver to detect deficiency of the anterior cruciate ligament; . . . a soft endpoint or greater than 4 mm of displacement is positive (abnormal)."  Lachman Test, Stedmans Medical Dictionary, 906190.  A McMurray Test is a

ray of the right knee revealed minimal degenerative changes. (R. at 271). Dr. Levin stated that the plaintiff had right knee pain with a possible medial meniscus tear and a possible chronic anterior cruciate ligament ("ACL") tear. (R. at 271). Dr. Levin ordered an MRI. (R. at 271).

On April 17, 2010, an MRI revealed a chronic ACL tear with scarring to the posterior cruciate ligament, a tear in the posterior horn meniscus, patellar tendinitis, and a subchondral cyst in the anterior tibial plateau. (R. at 286).

On May 6, 2010, Mr. Ricciardi saw Dr. Levin for a follow-up visit. (R. at 268). Mr. Ricciardi reported that he "does not really have significant pain in his knee," but that it is "unstable occasionally." (R. at 268). He stated that he wore a knee brace when working which provided him some relief. (R. at 268). Physical examination revealed a positive Lachman exam, "mild medial joint line tenderness," stable knee joints, and range of motion from "full extension to 140 degrees of flexion." (R. at 268). Dr. Levin concluded that Mr. Ricciardi had a right ACL tear and medial meniscus tear. (R. at 268). Dr. Levin explained that treatment "depends on what [Mr. Ricciardi's] activity level is. If he wants to remain active with certain

---

"rotation of the tibia on the femur to determine injury to meniscal structures." McMurray Test, MediLexicon, http://www.medilexicon.com/medicaldictionary.php?t=90652.

activities such as skiing, then he may strongly consider ACL reconstruction." (R. at 268).

On January 27, 2011, Mr. Ricciardi visited Dr. Levin again, complaining that his "knee gave out on him" ten days earlier while skiing. (R. at 266). On examination, he presented "mild-to-moderate effusion," range of motion "from 5 degrees short of full extension to 135 degrees of flexion," "mild medial joint line tenderness," and "[n]o lateral joint line tenderness." (R. at 266). His Lachman exam was positive. (R. at 266). Dr. Levin scheduled Mr. Ricciardi for ACL reconstruction surgery, noting he was an excellent candidate who maintained a "very active lifestyle including skiing." (R. at 266). Dr. Levin also recommended physical therapy. (R. at 267).

On the same day, Mr. Ricciardi saw Dr. Arthur Pidoriano at Mount Kisco Medical Group. (R. at 200-01). Mr. Ricciardi complained of right knee pain brought about by a skiing trip the past week. (R. at 201). Dr. Pidoriano noted that Mr. Ricciardi's past MRI showed an ACL tear, but that he managed with rehabilitation until the skiing mishap. (R. at 201). Dr. Pidoriano described Mr. Ricciardi as a healthy 50-year-old retired firefighter, who is "very active" because he "skis, bikes, [and] wake boards." (R. at 201). The physical examination revealed a "nontender" hip with "full range of motion," a swollen right knee, medial joint tenderness, and

stable knee caps. (R. at 201). Mr. Ricciardi's Lachman test was positive. (R. at 201). Dr. Pidoriano diagnosed Mr. Ricciardi with an ACL deficient knee and recommended ACL reconstruction surgery. (R. at 201). Mr. Ricciardi reported that he would "think about options and [] will decide on further treatment." (R. at 201). Dr. Pidoriano prescribed an anti-inflammatory and recommended home therapy and stationary bicycle exercise. (R. at 201).

ACL reconstruction surgery was scheduled for February 2011, but the plaintiff canceled it because he was "not ready." (R. 291).

On November 17, 2011, Mr. Ricciardi revisited Dr. Levin complaining of chronic lower back pain. (R. at 265). He noted that this pain did not radiate down to his legs. (R. at 265). Physical examination showed "tenderness to palpation" in the middle of the lumbar spine and paraspinal lumbar muscles. (R. at 265). Mr. Ricciardi could perform forward bending of the lumbar spine to 70 degrees without any significant pain, but pain occurred if he extended his lumbar spine from a flexed position. (R. at 265). He had pain across the lower back and lumbar extension of 5 degrees, but "5/5 strength in his lower extremities, . . . knee extension, ankle dorsiflexion, plantar flexion, and first toe extension bilaterally." (R. at 265). His sensation was equal and intact bilaterally. (R. at 265). A

bilateral straight leg raise test was negative.  (R. at 265).
Dr. Levin prescribed an anti-inflammatory for pain with home
physical therapy and ordered an MRI due to "chronicity of [Mr.
Ricciardi's] symptoms."  (R. at 265).

On December 27, 2011, Mr. Ricciardi visited Dr. Minerva
Santos of Mount Kisco Medical Group complaining of poor sleep,
frequent urination, and anxiety.  (R. at 222-23).  Dr. Santos
noted that Mr. Ricciardi was a contractor who fixed houses and
that he was upset about a recent sale.  (R. at 222).  Mr.
Ricciardi mentioned that coping with his mother's recent stroke
had been difficult.  (R. at 222).  He stated he was not sleeping
well, became forgetful, and did not "feel himself".  (R. at
222).  Treatment notes indicate that his girlfriend reported
that she was afraid to leave him alone because he did not pay
attention and she worried he could hurt himself.  (R. at 222).
Dr. Santos assessment stated Mr. Ricciardi's problem might
originate from metabolic or psychological functions.  (R. at
223).  Dr. Santos ordered extensive bloodwork and prescribed 0.5
Xanax.  (R. at 223).  Dr. Santos noted that Mr. Ricciardi was a
contractor and warned him not to operate heavy machinery before
learning how he responded to the medication.  (R. at 223).

On January 1, 2012, Mr. Ricciardi visited Dr. Albert Szabo
at Northern Westchester Hospital Center, complaining of anxiety,
obsessive thoughts about selling a house for too low a price,

headaches, and potential Lyme disease. (R. at 217). Dr. Szabo described Mr. Ricciardi as a former fireman who "works very hard maintaining a series of houses that he owns and rents out." (R. at 217). He further stated that Mr. Ricciardi was "awake, alert, and oriented to person, place and to time". (R. at 217). Physical examination revealed some anxiety and obsession, but was otherwise unremarkable. (R. at 217-18). Dr. Szabo diagnosed anxiety disorder and ordered more testing before he could rule out Lyme disease and intracranial abnormalities as the cause of the headaches. (R. at 218). He ordered a lumbar puncture, a brain MRI, and a psychiatric evaluation. (R. at 218).

Mr. Ricciardi was examined the next day by Dr. Jacob Goldberg at Northern Westchester Hospital Center. (R. at 208-09). Physical examination revealed that he was not in acute distress. (R. at 208). Laboratory data was unremarkable. (R. at 209). Dr. Goldberg noted that a psychiatric evaluation was performed in the hospital and that Mr. Ricciardi was offered impatient hospitalization for anxiety and depression, which he declined. (R. at 209). The psychiatric unit suggested starting Celexa and a benzodiazepine. (R. at 209). Dr. Goldberg wrote him a prescription for Klonopin to take as needed. (R. at 209). Additionally, Mr. Ricciardi's brain Magnetic Resonance Angiogram

("MRA"), Magnetic Resonance Venography ("MRV"), and MRI produced unremarkable results.[3]  (R. at 206, 210, 212).

On January 5, 2012, Mr. Ricciardi had a follow-up visit with Dr. Santos.  (R. at 205).  Dr. Santos noted that the plaintiff was feeling "somewhat better" and should continue his Xanax as needed and finish his dose of doxycycline for Lyme disease.  (R. at 205).  Dr. Santos strongly suggested that the plaintiff see a therapist, and Mr. Ricciardi said he would consider it.  (R. at 205).  Dr. Santos noted that "greater than 50% of [the] visit . . . . was spent on counseling and coordination of care regarding the plaintiff's Lyme disease and his new onset of anxiety."  (R. at 205).

On February 9, 2012, Mr. Ricciardi returned to Dr. Santos to follow up about his Lyme disease.  (R. at 204).  Dr. Santos noted that the plaintiff developed emotional, neurological, and musculoskeletal complaints after testing positive for Lyme disease.  (R. at 204).  Dr. Santos recorded that Mr. Ricciardi continued to take Celexa and Klonopin as needed, but still had "major complaints".  (R. at 204).

On March 1, 2012, Mr. Ricciardi visited Dr. Benjamin La Rosa at Birch Tree Medical Associates.  (R. at 227).  Treatment

---

[3] MRA and MRV are tests that utilize similar technology to MRI but create imaging of the arteries and veins, respectively. Kristyn S. Appleby & Joanne Tarver, Medical Records Review § 4.8 (2010).

notes described Mr. Ricciardi as a retired firefighter who was active in construction. (R. at 227). The plaintiff was concerned about symptoms of anxiety and depression. (R. at 227). He reported difficulty sleeping, lack of motivation, memory deficiency, and anhedonia. (R. at 227). He admitted using marijuana. (R. at 227). Dr. La Rosa diagnosed major depression, anxiety disorder, substance abuse, and amotivational syndrome secondary to marijuana. (R. at 227). He prescribed Lexapro and told the plaintiff to discontinue doxycycline because no Lyme infection was present. (R. at 227).

On March 28, 2012, MRI results revealed "[m]ultilevel degenerative lumbar spondylosis with significant progression at the L2-L3 and L5-S1 levels since [August, 2, 2007]." (R. at 285). The MRI further revealed "mild-to-moderate mid-to-lower lumbar facet joint hypertrophic osteoarthrosis." (R. at 285).

On April 5, 2012, Mr. Ricciardi visited Dr. Levin for follow-up regarding lower back pain. (R. at 264). Physical examination revealed diffuse tenderness in the middle of the spine and paraspinal lumbar muscles. (R. at 264). He could bend forward to 80 degrees without significant pain, but lumbar extension was limited to 5 degrees with discomfort in the lower back. (R. at 264). Mr. Ricciardi had full strength in his lower extremities, and sensation was equal. (R. at 264). Review of an MRI revealed "degenerative disc disease with

significant progression at L2-L3 and L5-S1." (R. at 264). Dr. Levin assessed that Mr. Ricciardi would be a good candidate for pain management and a therapeutic injection. (R. at 264).

C. Procedural History

Mr. Ricciardi filed a claim for DIB on April 17, 2011. (R. at 10). After the claim was denied on May 18, 2012, he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on June 26, 2013. (R. at 10). He was represented by an attorney at the hearing. (R. at 10).

At the hearing, Mr. Ricciardi testified that he felt irritable around people and that he could not stay focused. (R. at 58-60). The plaintiff testified that he could probably lift up to ten pounds infrequently, as when going grocery shopping, but that his girlfriend usually performed the heavy lifting because it bothered his back. (R. at 48). Regarding his daily activities, Mr. Ricciardi testified that he did not sleep well, waking at least three times a night and by 7:00 A.M. regularly. (R. at 46). He further testified that he spent his days reading the newspaper and watching television, although he had difficulty concentrating. (R. at 54-55). He stated that he could not work a simple job because he "can't stay focused long enough to look at the screen." (R. at 59-60). He denied skiing, stating that he had not been skiing for ten years. (R. at 62).

Mr. Ricciardi testified that he found relating to people overwhelming, and that he did interact with others on a day-to-day basis. (R. at 58). He stated that he was prescribed multiple medications for anxiety which he discontinued because he could not tolerate them. (R. at 51). He also felt they were addictive. (R. at 51). He further testified that he was not sure if he was ready to start therapy. (R. at 52).

On July 9, 2013, ALJ Arthur Patane denied Mr. Ricciardi's claim, and on December 20, 2014, the Appeals Council denied his petition for review. (R. at 4, 20). This lawsuit followed.

Analytical Framework

A. Determination of Disability

A claimant is disabled under the Act and therefore entitled to disability benefits if he can demonstrate through medical evidence that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months." 42 U.S.C. § 423(d)(1)(A); see also Hahn v. Astrue, No. 08 Civ. 4261, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009); Marrero v. Apfel, 87 F. Supp. 2d 340, 345-46 (S.D.N.Y. 2000). The disability must be of "such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and

15

work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is entitled to disability benefits, the Commissioner employs a five-step sequential analysis. 20 C.F.R. § 404.1520. First, the claimant must demonstrate that he is not currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Next, the claimant must prove that he has a severe impairment that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(a)(4)(ii), (c). Third, if the impairment is listed in 20 C.F.R. § 404, Subpt. P, App. 1 or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d). If, however, the claimant's impairment is neither listed nor equal to any listed impairment, he must prove that he does not have the residual functional capacity to perform his past work. 20 C.F.R. § 404.1520(a)(4)(iv), (e). Finally, if the claimant satisfies his burden of proof on the first four steps, the burden shifts to the Commissioner to demonstrate that there is alternative substantial gainful employment in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23

16

(S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77-78 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).  In order to determine whether the claimant can perform other substantial, gainful employment, the Commissioner must consider objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability, and the claimant's educational background, age, and work experience.  Hahn, 2009 WL 1490775, at *7 (citing Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam)).

   B. Judicial Review

   A court reviewing the Commissioner's decision "may set aside a decision of the Commissioner if it is based on legal error or if it is not supported by substantial evidence.'" Geertgens v. Colvin, No. 13 Civ. 5733, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting Hahn, 2009 WL 1490775, at *6).  Judicial review, therefore, involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal standard.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Calvello v. Barnhart, No. 05 Civ. 4254, 2008 WL 4452359, at *8 (S.D.N.Y. April 29, 2008).  Second, the court must decide whether the ALJ's decision was supported by substantial evidence.  Tejada, 167 F.3d at 773; Calvello, 2008 WL 4452359, at *8.  "In determining whether substantial evidence exists, a reviewing court must consider the whole record,

17

examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." Longbardi, 2009 WL 50140, at *21 (citing Brown, 174 F.3d 59, 62 (2d Cir. 1999), and Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)). Substantial evidence in this context is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hahn, 2009 WL 1490775, at *6 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). Additionally, the Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

   C. ALJ's Decision

   ALJ Patane evaluated Mr. Ricciardi's claim pursuant to the five-step sequential evaluation process and concluded that he was not disabled within the meaning of the Act between August 20, 2005 and December 31, 2011. As an initial matter, the ALJ found that the plaintiff last met the insured status requirement of the Social Security Act on December 31, 2011. (R. at 12).

18

At step one, ALJ Patane found that Mr. Ricciardi had not engaged in substantial gainful activity since August 20, 2005.[4] (R. at 12). At step two, he determined that the plaintiff had four impairments that qualified as severe and lasted for at least twelve consecutive months[5] -- lumbar degenerative disc disease, joint and facet arthropathy, osteoarthrosis, and an ACL tear. (R. at 12-13). However, the ALJ determined at step three that none of Mr. Ricciardi's impairments, nor any combination of those impairments, "met or medically equaled the severity of one of the listed impairments" in Appendix 1 of the regulations. (R. at 14). At step four, ALJ Patane found that the plaintiff "had the residual functional capacity to perform the full range of light work." (R. at 14). He found that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;" however, the plaintiff's statements about the persistence, intensity, and limiting effects of the symptoms were not credible because of the plaintiff's poor treatment history prior to the date last insured and because the "clinical and diagnostic testing [was]

---

[4] However, ALJ Patane noted that "treatment notes after 2006 reference work activity that suggests the [plaintiff] had earnings off the book, which would color his credibility." (R. at 12).

[5] The heading of the decision includes Lyme disease as a severe impairment, but the body of the decision makes clear that the plaintiff's Lyme disease is non-severe within the meaning of the statute. (R. at 12-13).

inconsistent with the alleged severity and limiting effects of
the [plaintiff's] . . . . impairments." (R. at 15-17). The ALJ
concluded that Mr. Ricciardi could not perform his past relevant
work. (R. at 19). However, taking into account his age,
education, work experience, and residual functional capacity,
the ALJ determined at step five, that "there were jobs that
existed in significant numbers in the national economy that [Mr.
Ricciardi] could have performed." (R. at 19).

Discussion

    A. Duty to Develop the Record

Mr. Ricciardi contends that the ALJ failed to develop a
full and fair record. (Plaintiff's Motion for Judgment on the
Pleadings with Supporting Memorandum ("Pl. Memo.") at 8).
"Because a hearing on disability benefits is a non-adversarial
proceeding, the ALJ generally has an affirmative obligation to
develop the administrative record." Perez v. Chater, 77 F.3d
41, 47 (2d Cir. 1996). The regulations require that the ALJ
"develop [the plaintiff's] complete medical history for at least
the 12 months preceding the month in which [the plaintiff]
file[d] [his] application." 20 C.F.R. § 404.1512.

The record contains medical reports dating as far back as
July 2007. However, ALJ Patane noted that Mr. Ricciardi failed
to seek treatment for his injuries after 2007 until April of
2010, pointing out that the plaintiff "has a poor treatment

history prior to [] December 31, 2011, [his] date last insured, which is when he would need to establish medically determinable and severe impairments." (R. at 15). Furthermore, treatment notes reveal that Mr. Ricciardi did not comply with prescribed treatment plans. For example, he took his medications infrequently and underutilized physical therapy. (R. at 229, 280).

At the beginning of the hearing, ALJ Patane asked about the status of the record. The plaintiff's attorney responded that the record "seemed to be complete." (R. at 26). During the hearing, both ALJ Patane and plaintiff's counsel questioned Mr. Ricciardi about his medical history. The record contains treatment notes for every physician discussed at the hearing. As the defendant notes, Mr. Ricciardi fails to identify any doctor whose records the ALJ did not consider. (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Ricciardi's Motion for Judgment on the Pleadings ("Def. Memo.") at 20). Therefore, any apparent gaps can be fairly attributed to Mr. Ricciardi's lack of treatment history.

Mr. Ricciardi specifically contends that the ALJ "failed to obtain updated and detailed medical source statements from the treating doctors" and failed to re-contact these doctors for relevant information regarding his residual functional capacity.

21

(Pl. Memo. at 6).   However, "remand is not always required when an ALJ fails in his duty to request opinions, particularly where. . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."  Tankisi v. Commissioner of Social Security, 521 F. App'x 29, 34 (2d Cir. 2013).   If the evidence received is consistent and sufficient, the ALJ may make a determination based on that evidence.   20 C.F.R. § 404.1520b.   Accordingly, the ALJ must re-contact treating physicians only if the evidence is inconsistent or insufficient to make a determination of disability.   20 C.F.R. § 404.1520b.   As discussed below, it is not.

### B. Residual Functional Capacity

ALJ Patane determined that Mr. Ricciardi had the residual functional capacity to engage in light work. The plaintiff contests this finding, noting that the "ALJ failed to explain how [p]laintiff's described daily activities translated into a capacity to perform light or other work." (Pl. Memo. at 7).

ALJ Patane found that Mr. Ricciardi could perform light work because his physical examinations were "generally benign" and because treatment notes often referenced Mr. Ricciardi's "very active" lifestyle. (R. at 18). This finding is supported by substantial evidence because doctors' reports described the plaintiff as "healthy," "active," "in no acute distress," and

22

with a basically insignificant past medical history. (R. at 201, 208, 217, 271). Further, treatment notes reveal examinations with generally unremarkable results. (R. at 206, 210, 212, 217). At one point, Mr. Ricciardi described his knee pain as not really significant. (R. at 268). The record contains numerous instances where Mr. Ricciardi referred to his contracting work, skiing, and other physical activities. (R. at 201, 222, 227, 266, 268, 270). Notably, the doctors' notes do not indicate that they advise him to abstain from such activities.

The plaintiff further contends that the ALJ "did not explain. . . . how the probative evidence showed that [Mr. Ricciardi] remained capable of performing" light work. (Pl. Memo. at 6). ALJ Patane found that Mr. Ricciardi could "sit, stand, and walk [] respectively for 6 hours total," could "lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently," and could "perform all nonexertional activities without limitation." (R. at 18-19). ALJ Patane considered Mr. Ricciardi's MRI results, indicating lower back pain, and Mr. Ricciardi's unrepaired knee injury when arriving at his determination. (R. at 19). Mr. Ricciardi testified that he could "probably lift 10 pounds" (R. at 48) and that he spends his days "walking around." (R. at 47). He further testified that he did his own shopping about twice a week, accompanied by

his girlfriend. (R. at 48). These descriptions of his activities support a residual functional capacity of light work. As ALJ Patane noted, the record revealed no deficiencies in "gait, stance, heel or toe walk, knee, squat, crouch, crawl, balance, climb, or tolerance for [ ] work-related activities." (R. at 19). When considered with multiple reports of his active lifestyle and construction work, this evidence substantially supports a residual functional capacity for light work.

The plaintiff also contends that ALJ Patane failed to consider evidence of mental impairment when determining his residual functional capacity. (Pl. Memo. at 6). However, the bulk of the notes in the record relate to anxiety occurring after the date last insured. Further, Mr. Ricciardi testified that he did not feel comfortable taking "brain pills." (R. at 51). His treatment history shows he did not regularly take his medication as prescribed. (R. at 252). Finally, Mr. Ricciardi's mental health symptoms did not persist for more than five months, well short of the requirement that a condition persist for twelve months in order to be considered disabled. (R. at 14).

C. Explicit Weighing

Mr. Ricciardi correctly claims that the ALJ failed to provide a description of the weight he accorded to each medical report. (Pl. Memo. at 6). However, the reports reveal

24

generally consistent medical findings.  No report in the record
contradicts or calls into question the findings of another
report.  Therefore, failing to assign specified weight to each
report is a harmless error and not grounds for remand.  <u>See
Navarro ex rel. Grullon v. Barnhart</u>, No. 02 Civ. 1748, 2003 WL
942535, at *2 (S.D.N.Y. March 10, 2003) (requiring remand
because "[t]he record contains apparently <u>contradictory</u> evidence
that the ALJ simply did not resolve or explain" (emphasis
added)); <u>Collado v. Apfel</u>, No. 99 Civ. 4110, 2000 WL 1277595, at
*1 (S.D.N.Y. Sept. 7, 2000) (noting that "remand was appropriate
so as to allow the Social Security Administration to weigh the
<u>conflicting</u> evidence in the first instance" (emphasis added)).

D. <u>Credibility</u>

An ALJ must consider subjective evidence of disability but
"may exercise discretion in weighing the credibility of the
claimant's testimony in light of the other evidence in the
record." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (per
curiam). "A finding that the witness is not credible must [] be
set forth with sufficient specificity to permit intelligible
plenary review of the record." <u>Williams ex rel. Williams v.
Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988). Most importantly,
the regulations require ALJs to compare the claimant's
statements with the medical evidence on record and then

25

determine whether the symptoms "affect [his] capacity to perform basic work activities."  20 C.F.R. §§ 404.1529(c)(4).

Here, the ALJ found that the plaintiff's and his girlfriend's statements concerning the intensity, persistence, and limiting effects of his medical impairments were not entirely credible.  (R. at 15).  In making this determination, the ALJ relied on the multiple doctors' reports detailing Mr. Ricciardi's work as a contractor through the alleged disability period, which undermine Mr. Ricciardi's testimony that he had not worked since 2005.  (R. at 18, 27-28).  ALJ Patane noted that "the claimant's work activity appears consistent with the [not fully supportive] physical examinations, the claimant's medication noncompliance, the claimant's poor participation in physical therapy, and the claimant's declining corrective knee surgery."  (R. at 18).

ALJ Patane also considered treatment notes which revealed that Mr. Ricciardi's physical activity levels were at odds with his alleged disability.  Multiple reports of his skiing contradict his testimony from the administrative hearing that he had not been skiing in ten years.  (R. at 62).  Mr. Ricciardi's girlfriend's testimony that he had not been skiing since retirement is not credible for similar reasons.  (R. at 66). Further, a toxicology report revealed positive results for marijuana, (R. at 209), even though the plaintiff denied drug

use.   (R. at 61).   This, too, calls into question Mr. Ricciardi's credibility.

The ALJ's assessment of the plaintiff's credibility is thus supported by substantial evidence.

Conclusion

For the reasons set forth above, the plaintiff's motion for judgment on the pleadings (Docket no. 11) is denied and the Commissioner's motion (Docket no. 15) is granted.   The Clerk of Court shall enter judgment accordingly and close this case.


SO ORDERED.


JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          November 16, 2016


Copies transmitted this date to:

Herbert S. Forsmith, Esq.
26 Broadway 17th Floor
New York, New York 10004

Brandon M. Waterman, Esq.
Assistance United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007